JUDGE TUCKER.
The bill states, that the complainant, Rebecca, is the daughter of one John Campbell, one of the defendants ; that he, before her marriage with the complainant, Andrew Campbell, at the time thereof, and after it, promised that he would give her the land whereon he lived, •subject to the payment of 501. to his daughter Hannah, which they were always ready, on their parts, to do. That in pursuance of this declaration, he directed his attorney to make his will, which was accordingly done; and that they knew of this disposition at the time it was made.
That in a conversation between Andrew and the father of Rebecca, before their marriage, on the subject of the marriage portion intended for his daughter, the father informed him of the disposition he intended, and which he then promised Andrew to make, of that land, of the will he had made to that effect, and that he had deposited it with an attorney who had drawn it.
That after the marriage, the father repeated the same thing, and desired him to apply to his attorney for satisfaction and advice, &c. &c. and being answered that the will was liable to revocation, the father agreed to execute any conveyance which should not divest him of the land during his life, as he honestly intended to fulfil his promise.
That accordingly, Andrew took advice as to the mode of finally securing himself and his wife the lands, and for that purpose had a bond drawn conditioned for the conveyance of the same, agreeably to his original promise, which the father executed.
*That thereupon the complainants rested satisfied that, at the death of the father, who was upwards of eighty years old, the land would be theirs; but they were afterwards surprised to hear that the father was about to sell the lands to the defendant, Argenbright; that he well knew of their claim before he proposed purchasing, and that they not only made known their claim to him, but published the same in a newspaper. That after this, both defendants went to the house of the attorney who had the will in possession, and took it away; and that the father and Argenbright, after such information, entered into a contract for the lands, which have been actually conveyed accordingly.
The bill prays for a conveyance to the complainants of the lands in the condition of the bond mentioned, which is referred to, and prayed to be taken as a part of the bill.
The defendant, John Campbell, by his answer acknowledges, that some time before the marriage he made his will, and left the land to his daughter Rebecca, upon condition of her paying ten pounds per annum, until 501. should be paid to his daughter Hannah. That he never knew Rebecca was going to be married to Andrew till the very day they were married; and that “he never renewed the promise” before their marriage, further, than that he had not as yet altered his will. That shortly after the marriage, Andrew, and his father, James Campbell, applied to him to havé possession, and Andrew wanted him to sign a bond, or paper, that the land was to be his at John’s death; and, at the time the bond was to be executed, Andrew was to pay 101. part of the 501. to Hannah, but when the bond was presented, Andrew refused to pay the 101. but said he would have all or none; after which he altered his will.
As to the bond mentioned in the bill, he solemnly declares that he never signed a *621 bond that conveyed the land from him to them; if he did, he must have been drunk or mad, as Andrew had frequently applied to him to have a bond, but was as often refused. That he then applied to him only to sign a bond to please Andrew’s father, and it should be given back to him again and destroyed.
*He denies remembering any such conversation as that stated, advising Andrew to consult with Mr. S. to know whether the will was sufficient to secure the estate to Andrew; admits the sale to Argenbright, and that he knew of the complainant’s claim, but was to run his chance.
The defendant, Argenbright, in his answer says, he knew of no contract between the plaintiffs and John Campbell before, or after their marriage, for the land in the bill mentioned: on the contrary, in a conversation with Andrew and his father and mother on the subject, a few days before he purchased, it was expressly several times mentioned by all the parties, that he did not marry the other complainant in consideration of any such contract, but that he should have married her if her father had not given her five shillings; and that he understood at the time, that Andrew claimed altogether under the bond and will alluded to in the complainant’s bill; that he desired to see the bond, which was at first refused, but at length he got a sight of it, and was advised that he might with safety purchase. That the other defendant, John C. told him he knew nothing of his daughter’s intended marriage till the day it took place, and had been solicited to give such a bond as in the bill mentioned, but had refused. He states, that he is the more convinced that the bond must have been obtained bj fraud and circumvention, (as John states,) either by Andrew or his father, as John was an old man much subject to intoxication, and they kept a distillery; and the witnesses are two young men, Andrew’s brothers.
James Campbell, father of the complainant, Andrew, swears that, several years before, John Campbell made his will, and lodged it in his hands, where it remained about two years; by which he left the land he lived on to his daughter, Rebecca, on condition of paying his daughter, Hannah, 501. in five years after his death; that, some time after, he took away his will, that he might get Mr. A. S. to draw it properly. That he afterwards told James it was done, but that he had not altered the former in substance, *and repeated the contents, which he thinks were the same. That, about six weeks before the complainants were married, John asked him if he was satisfied that they should intermarry, to which James made no objection; and, in answer to a question says, that at that time he has had no conversation with his son on the subject of his marriage, nor until a few days before it took place.
He further states, that a few days before the marriage, John came to his house, and, after some private conversation between him and Andrew, James was called in, and John, in his presence, gave Andrew his hand and promise, “That if he married his daughter, Rebecca, he should have the plantation he then lived on, provided he complied with the terms of the will: ” and then repeated the contents of it; the same in substance which he had formerly done to the witness. That, after the marriage, he often heard John speak in the manner above stated, and particularizes one occasion when he asked old Campbell “if -he did not mean to comply with his promise, why he made it?” To which the old man replied, “If he had not done so, perhaps the complainant would not have married his daughter:” “and that promises and pye-crusts were made to be broken; and told a story of a man having married all his daughters by promising them severally his plantation, and that the last had taken him in, by obtaining a writing, as the complainant was then going to do.” Peter Eagle, whose testimony I shall notice presently, gives, I think, a different and important turn to the complexion of this testimony. This witness, James Campbell, the father of Andrew, is the only witness who pretends to have been privy before the marriage to any promise, agreement or conversation whatsoever between John and Andrew Campbell. John Quinn, indeed, speaks of the conversation between them after the marriage, in which James is stated to have asked John, if he did not mean to comply with his promise, why did he make it? To which John replied, that promises and pye-crusts were made to be broken, and also said, *“If I had not promised him the land, perhaps he would not have married my daughter,” and then went on to tell the same ridiculous story. But Peter Eagle, who was present at the time, states that James asked John if he had not promised Andrew the land; to which he replied no: That James two or three times, and perhaps oftener, repeated the question; at length John replied, promises and pye-crusts were made to be broken, and then told the same story, but does not recollect that he said, that if he had not promised the land, perhaps the complainant would not have married his daughter. I therefore think, that the testimony of John Quinn and Peter Eagle, may be considered nearly as balancing each other, leaving that of James Campbell to stand or fall by itself.
And the story told by the old man, which may be regarded as an evidence of his shrewdness, may, in my opinion, well be compared with Sir John Bee's repeating scraps of Batin, and reading the classic authors, which Bord Hardwicke justly rejected as proofs of his sanity, in the case of Bennet v. Vade, (a) The repeated en-deavours of James Campbell to extort an answer from the old man, to an ensnaring question, lessen in my estimation, or rather destroy the weight it might otherwise have had; but, taking his replj in the most liberal sense, it amounts only to an acknowledgment of a parol promise, of some sort or other, without identifs'ing the terms or nature of it.
According to James Campbell’s testimony, John consulted him upon the intended marriage six weeks before it took place; and, a few days before, made Andrew the promise stated in James’s deposition. John, in his *622 answer, flatly denies that he knew any thing of the intended marriage until the very day it took place; and, in answer to a question in the bill, “Whether he did not promise his lands to his daughter long before her intermarriage with Andrew; and whether he did not renew his promise to them, or either of them, shortly before the marriage;” after admitting that he had made his will, and left the lands to his ^daughter upon the condition of paying Hannah 501. and, after declaring that he never knew of their intended marriage till the very day, he answers, that he never renewed the promise before their marriage, further than that he had not as yet altered his will. It will be admitted that this answer is not in as direct and positive terms, as it might have been expressed in: but I understand it as a substantial denial of any promise made in consideration, or even in contemplation, of the marriage intended between the parties ; and, taken in opposition to James Campbell’s evidence, contains a necessary, if not a direct negative, to the conversation stated to have taken place a few days before the marriage. His answer then stands upon the general ground, that an answer shall prevail, unless it be contradicted by two witnesses at the least, or one witness and pregnant circumstances. These are utterly wanting in this case. On the contrary, every circumstance appears to me to be strongly against the complainant, Andrew, and his most material witnesses. The credit of James Campbell is greatly shaken, in my opinion, by the evidence of Mr. Bowyer, who says he appeared to him to be the most immediately interested in the dispute, and said that he would spend not only his own plantation, but every thing else he possessed, but his son Andrew should get the land. The deposition of Samuel Woods is also calculated to weaken the credit of James Campbell, for he says that James Campbell said, in his presence, he knew nothing of the marriage till the evening before, which is an absolute contradiction to the assertion of a promise made in his presence to Andrew a few days before, in consideration of the intended marriage. The deposition of Hannah Campbell, and the uniform declaration of John Campbell to several other witnesses, that he knew nothing of the marriage till the day it took place, also contribute to strengthen the credit of John’s answer, as to this particular point.
But here it becomes necessary to consider the operation of our statute of frauds and perjuries, Rev. Code, 1 vol. c.-10, which enacts, that ‘ ‘no action shall be brought, *whereby to charge any person upon any agreement made upon consideration of marriage, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorised.”
It has on several occasions in this Court happened, that the counsel on both sides have, in addressing themselves to the Court, said, that they presumed the Court would consider the English decisions on the 29 of Car. II. c. 3, as authorities, in any case, founded upon our statute, which is nearly, or perhaps exactly, in the same words.
This was done by the counsel on both sides, in the case of Richardson v. Baker, (October 22d, 1805, MS.) but that case was decided upon another point. Although this observation was not addressed to the Court on the present occasion, the counsel on both sides have argued the question, as if this postulatum had been conceded to them. But I am not prepared to go so far as the gentlemen seem to have supposed. By the ordinance of Convention adopting the common law of England, the evidences of that law, being an unwritten law, were nec-cessarily I presume, adopted; and those evidences, which during a long series of years had received the sanction of the highest Courts of Judicature in England, acquired thereby a binding force and authority, which no exposition of a written law could claim a title to; much less, the expositions of a statute which never was acknowledged to be in force in this country, being made near a century after the settlement of the colony. Still less are the decisions of the Courts of Westminster-Hall made not only since the revolution, but since the passing of our statute, to be considered as having the authority of precedents in this Court. I shall always respect them as the decisions of great and learned men, but never admit them to controul my own judgment. Where they convince me, I will adopt them; where they fail of producing that conviction, I shall never feel any obligation upon myself to yield my ^assent to them. Were there no other reason for this resolution, the conflicting opinions of different Chancellors, as to the operation of this statute, and effect of the defendant’s relying upon it in his plea, would determine me to be extremely cautious how I should admit the authority of precedents which might operate as the repeal of a most beneficial statute. The true intent and meaning of our statute, according to my apprehension, is to reduce all such parol agreements as are mentioned in the purview of it, to the level of a mere nudum pactum. This strikes me as the most obvious interpretation of the first words of it, that no action shall be brought whereby to charge a defendant upon any special promise, contract, or agreement, therein particularly specified, unless the promise or agreement be in writing, and signed by the party to be charged therewith, &c. If a Court of Equity assume the right, not only to enforce such agreements, notwithstanding the statute, but to extort from a defendant, who relies on it in his plea, either a confession for the purpose of enforcing the agreement, or an absolute denial of it, in order to evade the performance, the temptation to perjury, is such as no man, who seeks to evade a contract fairly made, will probably withstand. The almost universal knowledge of letters in this country, and the perfect facility with which recourse may be had to pen, ink, and paper, and a person who can write, in all cases where the parties are seriously disposed to enter into a contract, obviate the objection, that fraud might be pre *623 vented by compelling the performance of such parol agreements; for, in every case within the purview of the statute, the most effectual means of preventing fraud or perjury, would be to construe them as mere nuda pacta, where nothing material has been done in performance of them, and the state of both parties remains the same, as before any communication had been made, or agreement concluded between them. And this construction, I am persuaded, if constantly adhered to, would effectually «relieve this Court from the dilemma into which the Court of Chancery in *England, has brought itself upon this subject, (a) If a parol agreement, in all the cases provided for by the statute, be considered in the light of a mere colloquium, or inception of a contract, instead of the completion of it, the citizens of this State will soon learn, that, to give effect to their agreements in such cases, they should be reduced to a visible form; and, so long as the implements and the art of -writing may be had recourse to easily as they now may, in this State, it is certainly advisable to discourage every possible temptation to the base crime of wilful perjury, which a contrary interpretation is too much calculated to encourage and promote. It has been observed, (b) that it is clear that the statute intended to prevent fraud, as well as perjury; but, from the purview of it, declaring that no action shall be brought, it appears to me that the true intent of it is to prevent the fraudulent imputation of a contract, rather than the fraudulent denial of one; the danger of the former being much greater than of the latter. And this construction I am the more confirmed in, by the opinion of Lord Lough-borough, and the rest of the Judges of the Court of C. P. (except Wilson,) in the case of Rondeau v. Wyatt, (c) who says, “If a parol agreement were stated in a Court of Law, and there was a demurrer, which would admit the agreement, yet still advantage might be taken of the statute and surely equity is equally bound to notice it, though not pleaded, nor relied on in the answer, for it is a public statute, and as such, ought to be noticed by the Court :(d) I am, therefore, of opinion, that, with respect to all promises, agreements, and contracts within the purview of the statute, if not reduced to writing, and signed pursuant to the statute, and if nothing be done in performance of them, whereby the actual state of the parties, or one of them, is materially affected; they ought to be considered as imperfect and incomplete, so as to be incapable of supporting a suit, either at law, or in equity; consequently, that wherever a defendant to a bill, for the specific performance of a parol agreement, pleads and relies upon the benefit of the statute, he is not compellable to answer as to the agreement, *and confess or deny it, but may protect himself from such answer by his plea ; and where offered and insisted on, it ought to be allowed: for, by compelling a defendant to answer after he has claimed the protection of the statute by his plea, the inducement to perjury, which it is the object of the statute to prevent, will be increased in tenfold proportion.
But where a defendant, without pleading the statute, or relying on it in his answer, confesses the agreement as stated in the bill, and allows the bargain to be complete, and does not insist on any fraud, circumvention or surprise, in obtaining it, it may be trmy said, there can be no danger of perjury; because he might (according to my construction) have protected himself from answering, by pleading the statute, had he chosen to do so; and because, having waived the benefit of that protection, (which he must be presumed to have done voluntarily,) he hath, by his own acknowledgment, taken awaj the necessity of proving the agreement.
In this case the benefit of the statute being waived by the defendant, (nam quisque potest renuniciare juri pro se, introducto,) a Court of Equity will enforce the performance of a contract thus voluntarily confessed, and disclosed to it. But, on the other hand, if he confesses the agreement, but yet insists on the benefit of the statute, either by way of plea, or in his answer; or, if he denies the agreement altogether, as charged in the bill, without pleading, or insisting on the statute, he may yet claim, and have the benefit of it at the hearing: and if he admits, even, that there was a parol agreement, but that it is different from that alleged in the bill, no parol evidence ought to be admitted to prove it. And this doctrine, I conceive, may be fully proved by the following cases, in addition to those I have already noticed.
In the case of Rondeau v. Wyatt, (2 Hen. Black. 63,) it is said' that the true rule seems to be, that if the party admits the agreement in his answer, without insisting upon the statute of frauds, the Court will hold it to be good; for which Prec. in Cha. 208, 374, 553, are cited: but, *where the statute is pleaded, and the exceptions in it negatived, the Court of Chancery will not compel the defendant to execute; and Whaley v. Bagenal, (e) and Whitchurch v. Bevis(f) are cited. It is added that the Court of Exchequer had also holden, that if the defendant by his answer insists upon the statute, a specific performance cannot be decreed, though he confesses the agreement: and Stewart v. Careless, and Eyre v. Iveson, cited in Whitchurch v. Bevis, (g) are referred to. In the case, then, before the Court, the defendant in his answer to a bill in Chancery, admitted the agreement charged in the bill, but pleaded the statute of frauds; and averred that there was no note or memorandum in writing, nor any performance of any part of the agreement, (h) A suit being brought in the Common Pleas, upon the contract thus disclosed by the defendant’s answer in Chan- *624 eery, and a verdict for the plaintiff; on a rule to shew cause why the verdict should not be set aside, and a nonsuit entered, Lord Loughborough, in delivering the unanimous opinion of the Court, three Judges being present, (the fourth being absent, and, as was afterwards said, being of a different opinion,) said “in some early cases, Prec. in Cha. 208, and 378, (though in fact no such decree was made in those cases, which contain merely extrajudicial opinions of the Lord Keeper or the Master of the Rolls,) it has been said, and has been adopted in the argument of this case, that, when the defendant confesses the agreement, there is no danger of perjury, which was the only thing the statute intended to prevent. But this seems to be very bad reasoning; for the calling upon a part}' to answer a parol agreement certainly lays him under a great temptation to commit perjury. But, though the preventing perjury was one, it was not the sole object of the statute; another object was, to lay down a clear and positive rule, when the contract of sale should be complete.”
And the rule for setting aside the verdict, and for entering a nonsuit, was made absolute. His Lordship added, that it was observable, the case of Whaley v. Bagenal, in the *House of Lords, (a) coincides with the determination of the Court then made.” X accord most perfectly in the opinion of Lord Lough-borough, and in the reasons he assigns.
In 3 Ves. jun. 38, 39, 40, note(a) a review of the cases upon this subject, similar to that in 1 Eonb. b. 3, s. 8, in notes, is taken ; the reporter concludes that review, by saying, that the result seems to be, that the statute may be .used as a bar to the discovery. And in Moore v. Edwards,(b) the Lord Chancellor seems to incline to the same opinion. Though in a subsequent case, Bowyers v. Caton,(c) he appears to have given a different one. But in Main v. Milbourn,(d) the plea of the statute, where the defendant had rested upon the plea only, without answering, was allowed; what afterwards became of the cause does not appear.
In Cooth v. Jackson, 6 Ves. jun. 12, Lord Loughborough, Ch., and Lord Eldon, who succeeded him, were successively of opinion, that, upon a bill for a specific performance of a parol agreement, within the statute of frauds, the defendant, though admitting the agreement by his answer, may, if he insists upon the statute, have the benefit of it at the hearing. Lord Eldon, indeed, was of opinion that, if he did not insist upon it, he must be taken to have renounced the benefit of it. But that, I apprehend, must be where the agreement is fully confessed in the bill. I think it unnecessary to examine the cases on this head any further; the reasons given by Lord Loughborough in Rondeau v. Wyatt, weighing with me more than any authority or precedent to the contrary.
In the present case, the defendant hath not pleaded the statute of frauds, nor relied on it in his answer. And, although it may be thought that he has not sufficiently denied the parol agreement in his answer, yet certainly he has not confessed it, nor even admitted it, as charged in the bill. If the case bore no relation whatsoever to-the statute of frauds and perjuries, I should be of opinion, that the answer does contain a sufficient denial of the agreement, to put the complainants upon the proof of it.
*If the cause had been set down for argument, upon the bill and answer, only, could-the Chancellor have made any other decree, than to have dismissed the plaintiff’s bill ? I conceive that he could not; for, if the defendant do not answer the allegations of the plaintiff’s bill, nor by his answer confess them, although there be alle-gata before the Chancellor, there are no probata : and, it was the folly of the plaintiff not to except to the answer, (1) if he relied upon a discovery of facts known to the defendant only ; or, not to have proceeded to take depositions to prove the allegations of his bill, if he thought he could obtain such proof elsewhere. ' What then is the state of the present case ; let it be admitted that the defendant hath not, in express terms, denied any agreement; it must also be admitted that he has not confessed, that which is charged in the bill, nor admitted any promise whatever made to the plaintiffs, or either of them, in consideration of the intended marriage. The promise to his daughter was without consideration, and being one which was to be performed by his will, was revokable at his pleasure. It was made years before the marriage was in contemplation ; and he swears, he never renewed it, further than that he did not alter his will. It is true, there is the evidence of a single witness which contradicts this ; but, exclusive of the reasons which I have before offered, for thinking this evidence not sufficient to countervail the answer, I shall now hazard the opinion that, although the statute is neither pleaded, nor relied on in the answer, the evidence ought not to be regarded ; because it appears upon the face of the bill, that the promise alleged is within the statute of frauds. We have already seen that in the case of Rondeau v. Wyatt, it was held that, if, to a declaration at law setting forth such a case, there should be a demurrer, still the defendant should have the benefit of the statute. And why not if there had been a demurrer to this bill ? Hath a Court of Equity the power to annul a ^public and general statute, any more than a Court of Law ? If it hath not, why is it not bound to take notice of the nature of the agreement, in the same manner? And if it be such an one as the statute declares no action shall be brought upon, will it take upon itself to enforce it, non obstante the statute ? But a precedent may be found, even in a Court of Equity, where the plaintiff set forth an agreement by parol, in one manner, and the defendant acknowledged the agreement as set forth in the bill in sundry particulars, but insisted that the new lease (which was the subject of the parol agreement) was not *625 to commence until the expiration of the old one; making- a difference of four years, between the time the plaintiff contended for it to commence. The deposition of a witness was taken, but the Chancellor declared, upon that bill and answer, it would be very dangerous to admit parol evidence on either side ; and decided upon the bill and answer only, (a) In that case, the statute was neither pleaded nor relied on in the answer ; and it appears to me fully to resemble the present case in principle. Should the Court decide that the agreement is not denied altogether by the answer, yet, as it appears, on the face of the bill, that the agreement set forth is within the statute of frauds ; and the defendant not having confessed it by his answer ; parol evidence to prove it, aliunde, ought to be entirely rejected ; and consequently the bill ought to be dismissed. So in the case of Brodie v. St. Paul,(b) where an agreement in writing for a lease of a farm, referring to a paper containing the terms specified in certain items, parol evidence, to prove which of the clauses in that paper had been read at a meeting between the parties, though read and not objeded to by the defendant, was rejected by the Court, as being directly prohibited by the statute, although neither pleaded nor relied on in the answer; and the hill was dismissed. And in the case of Cooth v. Jackson,(c) Lord Chancellor Eldon declared, that if a defendant denies that any parol agreement ever took place, a Court of Equity will not inquire into the truth of that denial. The same Judge says in the same page, “all the doctrine of a Court *of Equity upon that subject, attributes great weight to the oath of the defendant.” And further, that, “the moment that the defendant in the form in which issue is joined in that Court, by his answer, says, there was no agreement, the witness could nol be heard ; or, if he was heard, unless supported by special circumstances giving his testimony greater weight than the denial by the answer, the Court could not make a decree.”
As to the necessity of pleading the statute, there is, perhaps, a reason why it is not as necessary to plead this statute, as it is to plead the statute of limitations, which it may not be improper to notice. The date of a contract, where no deed or instrument is referred to with a profert in curia, is never truly set out in a declaration at law : in order, therefore, to bring the contract within the statute, it must be pleaded, and then the Court is bound to look at the true date ; but, in cases within the statute of frauds, the nature of the case must in general be shewn by the declaration, or the bill. In such cases the Court is sufficiently apprised of the nature of the agreement to decide upon the face of the declaration or bill; if the nature of the agreement do not so appear, then, indeed, the defendant must apprise the Court of it, either by pleading, or by his answer, in order to have the benefit of the statute.
But if may be thought that there has been a part-performance in this case, the plaintiffs having intermarried. But it would be a very dangerous precedent indeed, to admit that the consummation of a marriage was to be taken as the ground to enforce a marriage contract, unless the contract itself be first fully and clearly proved; especially when it is considered how rare marriage-contracts are in this country. In the present case, it is in proof that the plaintiff, Andrew, declared he did not marry the other plaintiff,, in consideration of the land, for that he would have married her if her father had not promised her Ss. If then the jiromise alleged in the hill was no inducement to the alliance, the bare circumstance of the marriage, ought not to be relied on as a part-performance of the agreement, until the *agreement itself is fully established, which I consider is not the case.
Tn the case of Rowton v. Rowton,(d) the circumstance of the son’s having removed himself and his family from Kew-River, in Montgomery County, to Charlotte County, in consequence of his father’s promise to give him the land in question, was not regarded by the majority of the Court, as a sufficient manifestation of the nature of the promise made, for them to decide that he was to have an estate of inheritance in it. And the reason is equally as strong in this case, that the bare circumstance of a marriage having taken effect, between the complainants, shall not be admitted to supply any defect of proof of a promise alleged to have been made in consideration of marriage, (e) But, perhaps, it may be considered that the reference made by John Campbell to his will, already made, and in the hands of an attorney, in the conversation alleged to have taken place between him and the complainant, Andrew, in the presence of James Campbell, before the marriage, will be sufficient to take this case out of the statute of frauds and perjuries. But, I am of a different opinion upon that point ; for the statute means to prevent the imputation of any contract, or agreement whatsoever, made, or pretended to be made in consideration of marriage, unless the very promise itself, or some memorandum or note of it be made in writing, and signed pursuant to the statute.
The fact of making a promise in consideration of marriage, is one thing, the term s of the contract another. The promise itself, and the consideration upon which it was made, must be in writing, as well as the terms of the gift, or nature of the advancement proposed to be made. The danger of perjury is fully as great to admit proof of a parol promise, made in consideration of marriage, never to alter a will already made, as if the tenor of the will were repeated, in making such promise. The whole promise, or contract then, whatever it he, must be in writing, or it is within the true intent and meaning of the statute, for if there be any part of it which requires parol testimony to *prove it, it is within the mischief, and, as 1 conceive, the very words of the statute. As where, in an agreement for the lease of a term, referring to a pa,per containing the term, parol evidence to prove which of the clauses in that paper had been read at a meeting between the par *626 ties was refused.(a) Nor can you, by any reference to a paper not before the parties, convert into an entire promise, or agreement in writing, any promise or reference made by parol only. To illustrate this, let us suppose John Campbell had, at the time of the alleged promise, in fact, made no will; or that his will should afterwards have been destroyed by accident; could this parol promise, alleged in the bill, have been set up on the ground of fraud in the one case, or accident in the other ?
But, should the Court be of opinion that the defendant, Campbell, is chargeable upon this parol agreement, we are next to consider whether the plaintiffs are also entitled to relief against the defendant Argenbright ; who is, I think, a fair purchaser, for a full and valuable consideration, and, as he swears in his answer, without notice of this parol agreement, or that the marriage was concluded with a view to the promise of the land which he purchased; and this, he says, he understood from the complainant Andrew’s own declaration that he did not marry in consideration of any such contract. This is a direct answer to one of the charges in the bill, and to one of the interrogatories put to him : and it is not contradicted by any evidence in the record. I speak now of the parol agreement only, and not of the bond, as it is called, which I shall consider hereafter.
Independent of the general rule that a fair purchaser without notice, shall not be affected by any latent equitable claim which another may have upon the lands which he hath purchased ; and, independent of the declarations of the complainant Andrew, to the defendant Argenbright, that he did not marry for the consideration of the land; (which the defendant understood as a disavowal of any claim, such *'as is now set up ;) the refusal of the complainant Andrew to let him see the bond under which he claimed, until after repeated applications, might have justified him, perhaps, in making the purchase in the mean time. For, as the land was offered for sale by the proprietor, although the complainant by a public advertisement had warned all persons from purchasing, that warning was not sufficient to attach notice to a purchaser, who had personally applied for information of the nature of the complainant’s claim, and been refused satisfactory information in respect to it : or who had received information of a claim substantially different in its nature, from that which constituted his real claim. If, for example, the claimant, setting up a claim under a voluntary promise in writing, should represent to the person making the inquiry, that his claim was founded upon a bond or agreement for a valuable consideration actually paid, and the inquirer, being refused a sight of the instrument, should proceed to conclude the purchase, could equity construe this to be such a notice as to impeach the purchaser’s title? I presume not. If, then, Argenbright’s inquiries were answered only by a reference to the bond, and that bond was refused to be shewn ; or if, when shewn, it contained no reference to a contract or agreement, made in consideration of a marriage intended to be had between the complainants ; nor recited such previous contract, as the consideration upon which the bond was given, then cannot Argenbright be at all affected by this parol agreement, between the father and the complainants ; although the father himself should be chargeable upon that account.
I proceed now to consider the instrument which is called a bond.
The penal part of the bond is for 4001. to be paid for the complainant, Andrew, in the usual form ; at the foot of which the mark of the defendant John Campbell (without any seal) is affixed, and the names of the two witnesses, Michael Campbell and James Campbell, are written opposite to it on the left hand. Then follows what imports to have *been intended as the condition of the bond; which recites that whereas the above named Andrew Campbell, had lately married with Rebecca Campbell, daughter of the above named John, and for a consideration (not naming any) John had promised and agreed to give to the said Andrew and his heirs, the land whereon he now lived ; and, the better to comply with that promise, had made his last will and testament, and left it in the hands of A. S. in which he had particularly bequeathed the aforesaid lands to the said Andrew and his heirs for ever, and had promised that that instrument of writing should be his last will and testament, so far as related to that land. Now if the said John should not alter his will so as to change that part of it which relates to the land, nor in any manner or form whatever, convey or cause the same to be conveyed in his life-time, so as to deprive said Campbell, his heirs or assigns, of the benefits thereof, then the obligation to be void, or else to remain in full force and virtue. Then follows Andrew Campbell’s name and seal, with the attestation of the same two witnesses who attested the subscription of John Campbell.
Before I proceed to consider the legal character and effect of this instrument, I must observe that, from the manner and circumstances under which it appears to have been obtained, it is entitled to no favour in a Court of Equity.
In the first place, the complainants charge in their bill that the defendant, “John Camp-1 bell, was an aged man, upwards of eighty years old.” James Campbell, the complainant’s father, says, in his deposition, that he would not agree to the bond’s being signed at his house, lest it should be said, that as the old man "was subject to drink, and one or the other (for it is not, from the record, easy to ascertain which) kept a still, an advantage had been taken of him. The difficulty of understanding which, arises from a word being abbreviated in such a manner as to appear like the word defendant instead of deponent, but Arg'enbright’s answer removes it, and shews it should be deponent. The same witness tells us the old man, when it was proposed to *him to get the Reverend Mr. Scott, to draw the writing, objected to it; observing, that he might tell his wife, and that some uneasiness might be occasioned, if his family and other children should hear of it; after which the corn- *627 plainant had the writing- drawn by an attorney in Staunton ; according to the information given him by the complainant Andrew, and his father; as appears from Mr. 'Kinney’s deposition. None of John Campbell’s family appear to have ever heard, or been present at any conversation or communication whatsoever, respecting this marriage promise or the bond. Every thing passed at the house of the complainant’s father, the only witness to the promise ; and the active party in the whole business, until it comes to signing the bond, which he avoided being present at ; nor would he even permit it to be executed at his own house, lest it should be said (for the reasons above mentioned as assigned by himself) that an advantage had been taken of the old man.
There are few stronger badges of fraud than such over caution. But, where, when, and how was the instrument executed ? In the woods ; immediately after the old man had left the house at a place previously appointed for the complainant’s two brothers to repair to witness the signing, and whither the old man was enticed by the complainant himself, under the pretext of shewing a particular tree to be cut down, for no other purpose, that appears, but that of getting the old man completely in his power. Stronger badges of fraud never appeared in any Court. The case of Sir John Bee in Bennet v. Wade and others,(a) falls far short of it, in my opinion. But what say the subscribing witnesses ? James Campbell, jun.t ells us the complainant Andrew, and John came to the tree together, where the witness had been previously left by Andrew to wait his return with the old man. That, as soon as Michael, the other brother and subscribing witness came, Andrew offered the old man the paper to sign ; to which he said “he was agreed, if it would be of service to him ; that he could not write his name.” The complainant replied “that it would *be of service to him, and that, if he would make his mark, he would write his name.” The old man then made his mark accordingly. The instrument thus obtained, was not read to him at that time; and, though James Campbell swears it had been read over to him twice, at his house, non constat, that it was the same paper, nor that it was read to him truly. A pocket flask full of whiskey, which, as this juggling scene was not to be transacted at the still, it seemed necessary to take along with them, ought not to be forgotten in the list of implements employed on the occasion. Is there a single feature of fraud, circumvention and trick, wanting to complete this picture ? Every conversation, or communication, upon the subject, either of the pretended promise, or of the bond, took place at James Campbell’s house ; or more properly at the still; for the one is identified with the other, in Argen-bright’s answer. None of John Campbell’s family knew, or were permitted to know, any thing of either. The old man is beset and teased with repeated leading, and ensnaring questions ; for what else is the conversation sworn to by John Quinn, to which Peter Eagle was also a witness ? The directions for drawing the bond are not given by the party who was to sign it, but by the other party, and his father. If ever read over to him, it was only in the presence of the same parties, and at the still. It was not signed there, “lest it should be said that an advantage had been taken;” but, was the case altered by enticing the old man into the woods, and placing the flask of whiskey, the panacea of his dotage, before him 7 Or can it be said that an instrument, so prepared, offered, and executed, is, either at law, or in equity, the contract of the party signing it ? Every agreement to merit the interposition of a Court of Equity, must be free from fraud, circumvention, or suspicion. (b) And to the same effect Eord Chancellor Eldon(c) said, “if there were any sort of surprise he could not decree a specific performance.”
I shall now consider the legal character and effect of this uncommon instrument, thus obtained by means not less uncommon. I have before mentioned that the name of the ^defendant John Campbell, and of the two subscribing witnesses, are signed immediately under the penal part of the paper, and above what is called the condition, and without any seal prefixed to his subscription; not even a scroll, by way of seal. The other party subscribed his name at the foot of what is called the condition, and so did the witnesses; and, opposite the subscription of Andrew, there is a seal or scroll.
Bet it be observed that no mistake in the execution of this instrument is either suggested in the bill, or by the witnesses ; this Court must take it, and construe it, as they find it upon the record. It must stand or fall by its own intrinsic weight, as the act, or acts of the parties respectively, in the very form in which it appears, and in no other; and must be interpreted according to the rules of law, as they may be applicable to instruments in that form. There is no proof either upon the face of the instrument, or the attestation of the witnesses, or in their depositions, that the old man ever sealed it, or acknowleged and delivered it, as his act, and deed. He merely made his mark, probably where he was directed to do it; and the witnesses have proved nothing more. Taking it, then, as under this view of the case it must be taken, it was a written promise to pay 4001. to Andrew Campbell, and nothing more. The words “I bind myself, my heirs,” &c. will not make it an obligation, as was determined in the case of Hites, Executors of Smith, v. Bewis, in this Court,(d) nor can it be regarded as a deed, (being without a seal,) as was determined in the same case. It is then a mere naked promissory note, for the payment of money, and nothing more.
The instrument signed by Fielding Bewis, was couched in as strong terms of obligation as this is ; it wanted a seal; and this Court pronounced it a mere nudum pactum to indemnify Smith’s executrix for her testator having been the security for the son of Mr. Bewis. If, in that case, the want of a scroll, or seal, could annihilate the obligation created by the words “I hereby oblige myself, my heirs, executors, and administrators,” will not the same omission *operate in a similar manner upon this *628 instrument? So far at least as to reduce it to the level of a simple contract debt, for the payment of 4001. instead of a bond for that sum ; or for a conveyance of land? If so, the party had a full and complete remedy at law, and no pretext whatsoever to bring this bill in a Court of Equity. And, .even if this Court should decide, contrary to the decision in Hites v. Lewis, that this paper is a bond, though there is no seal to it, nor any proof of sealing and delivery, both of which are necessary to constitute a deed, yet, if I am correct, it is a single bond for the payment of money. The execution of the defeasance by Andrew, is not proved by the witnesses, nor is its existence at the time, when the old man made his mark, at all proved. It might have been an after thought of Andrew ; a voluntary act done by him, without the agreement, knowledge, or privity of the old man : and, without these, it could only operate to the advantage of the obligor, if he chose to avail himself of it ; and not to his disadvantage. And such I understood the principle established by this Court in the case of Gordon v. Frazer, (a) This construction of the instrument is consistent with what the old man swears to in his answer, that he never signed a bond that conveyed the land to the complainant; if he did, he must have been mad or drunk. Apply this to the instrument, as it appears in the record ; and it is most strictly true.And, since a Court of Equity attributes great weight to the oath of a defendant, where that oath can be reconciled to the strictest truth by giving to the instrument spoken of a legal construction, surely the Court will do so, rather than impute perjury to the defendant, by adopting a different construction. As to the doctrine of defeas-ances, as contradistinguished from the conditions of bonds, I beg leave to refer to 2 Black. Com. 327, 342, and 2 Saunders, Fowel v. Forest, p. 47. and the notes on that case. I have premised that no mistake is alleged to have been committed, in the manner of executing this instrument. I did so, by way of anticipating the observation, that equity will construe every deed, or other instrument, *according to the real intention of the parties. That intention, since there is no allegation or evidence of a mistake, must be collected from the instrument itself; and, in the construction of it, for the reasons already assigned, equity must follow the law. But what is the condition of that bond, if it be one? It recites that, “whereas Andrew Campbell had lately intermarried with Rebecca, daughter of the above named John Campbell, and for a consideration, the above bound John had promised, and agreed, to give the said Andrew that tract of land whereon he lived,” &c. Here I would ask what was this consideration ? There is no mention of any whatever : if, instead of a bond to convey, he had executed a conveyance for the land, in all due form, and solemnity, without mentioning any consideration for the gift, what construction would the law put upon such a conveyance ? That it was to the use of the grantor and hisheirs, and not of the grantee. But, let it be granted there was a consideration ? it might have been a good one ; or it might have been founded upon usury, gaming, fraud, collusion, or otherwise in malificio. If to the former class, why was. it not inserted ? That it was not founded on any agreement made in consideration of a marriage intended to 'be had, must be inferred from the omission to insert it; if it were not founded upon that, the bond could acquire no validity or support from, the marriage. If the consideration be not shewn to the Court, will the Court take upon it to decide that it was a good or valuable one, and enforce the performance of the condition ; or leave the party to his action at law, if he can support one upon this instrument ?
Again, the bill charges that the old man said to his son-in-law, after the marriage, that he honestly intended to fulfil his promise ; (viz. that alleged to have been made before the marriage;) and if his will, which he considered as sufficient to convey the land, was thought insufficient for that purpose, he would give a writing which should be considered so; and thereupon the complainant had a bond drawn conditioned for the conveyance of the same, agreeably to his *original promise. Does this instrument answer to-that character ? The alleged promise was of a gift of the land to Rebecca, by his will deposited in the hands of A. S. Esq. upon the condition of the payment of fifty pounds to his daughter Hannah. The condition of this instrument recites a promise made to Andrew to give him and his heirs the land ; and that the better to comply with that promise, he had made his will and left it in the hands of A. S. “in which said will he had particularly bequeathed the aforesaid land to Andrew and his heirs for ever,” and had promised not to revoke that devise. Now, it is not pretended that the name of Andrew was mentioned in the will so described. It was made long before the pretended promise; before his courtship was known, or perhaps even thought of by himself. Can this bond, then, pretend any con-nexion with the promise alleged to have been made in consideration of the intended marriage between the complainants, and with reference to that will ? The recital is proved to be false by the allegations of the bill; and by the testimony of James Campbell, the only witness who pretends to prove a promise made before the marriage.
Is not this an additional badge of fraud? Is not the attempt to deprive Hannah of the provision intended for her by her father in his will out of this land, a further badge, or rather proof of actual premeditated fraud ? And will this Court support or countenance a transaction, every period of which is marked with a blot ? In the case of Thornton v. Corbin, (b) one of the Judges of the Court is reported to have held, that a deed variant from the terms of a marriage promise was not obligatory on the party : and, where the variance is so great as in the present instance, I can feel no doubt of the correctness of the opinion.
Once more ; suppose the old man had died *629 ■without altering or revoking his will, or dis■posing of the land ; and that Andrew had brought a suit at law upon this bond, because *the land was not given to himself unconditionally, according to the tenor of its condition ; could he have recovered, if it had been shewn that the will -was in fact the same the old man had made before the marriage, and had deposited in Mr. Stuart’s hands ? Or suppose that, instead of claiming under the will, he had brought a suit in equity against the heirs of the old man, for a conveyance according to the condition of this bond ; would this Court have decreed him the land, in exclusion of his wife ? Or would it have decreed it to him, discharged of the payment of the fifty pounds to Hannah ? If this Court would not have made either of those decrees, as I presume it would not, is not that circumstance alone sufficient to prove that this bond is a felo de se ?
Upon the whole, it appears to me that there never was a case less entitled to the favour, support, or countenance, of a Court of Equity ; and that the plaintiff’s bill ought to have been dismissed with costs ; consequently, that the decree ought to be reversed, &c.
JUDGE ROANE.
I will consider this case under two general points of view : 1st. In relation to the promise or promises made before the marriage; and, 2d. In relation to those made after, and, particularly, to that evidenced by the bond or writing of the 9th of May, 1793. Some general considerations, however, appertain to them both, which it will be first necessary to dispose of.
In the first place, it is said that the contract embraced by these promises is unreasonable. The answer is, that a father has power to make an unequal distribution of his estate among his children ; and, in the present instance, his resolution, as to the disposition in question, was not hastily taken up, of short duration, or made without due reflection. He had continued in this mind for more than two years, while the will was in the possession of James Campbell, and afterwards while it was in the hands of Mr. Stuart. The existence and long continuance of this disposition on the part of John Campbell, would, in the case *of equiponderant testimony, incline the scale in favour of a promise made in per-suance thereof.
Again, it is said, that the appellant, John Campbell, was very old and subject to drink. It is, however, not only not shewn that he was in his dotage at this time, but, on the contrary, a considerable degree of sagacity {not to say archness) is inferable from the conversations and circumstances stated in the testimony. As to his liability to drink, it is not shewn that at any one of the periods in question, he was intoxicated: on the other hand, it is expressly proved that he was sober when the writing of May 9th, 1793, was executed.
With respect to the imputed ignorance of the marriage on the part of John Campbell, and of James Campbell and family, the Reverend Mr. Scott’s testimony gives the proper explanation. That ignorance is only to be applied to the day of the marriage, and not to the engagement, or courtship, which the witness says “was talked of in the neighbourhoodand it is observable that all the witnesses on this point, are merely interrogated as to the marriage, (that is, as I understand it, or at least as it might have been understood by the witnesses, as to the day of the marriage,) and not as to the courtship, or engagement. We must either adopt this construction, thus supported by Scott’s testimony, or impute perjury to witnesses who swear positively as to John Campbell’s ignorance on this subject; in direct opposition, not only to probability, but also to those witnesses who swear positively that John Campbell made and confessed, (respectively,) a promise before the marriage.
As to the secrecy of old John Campbell on this subject, and his executing the writing at the tree, instead of his own house, it is readily accounted for, not only by the condition and circumstances of the witnesses, being labouring men employed at their daily labour, but also by his not wishing, by doing it at his own house, to displease his other children, who seem, in the event, to have taken so warm an interest in opposing the claim of the appellees.
*A great deal has been said tending to impeach the credit of, and impute fraud to James Campbell and his two sons. Fraud is never to be presumed, when the conduct in question can otherwise be fairly accounted for. The feelings of a father in behalf of a son supposed to be injured, will go far, even to excuse the part taken by James Campbell in this business ; but neither he nor his other sons had any interest in the transaction in question. It was not till after a refusal by Scott, on the ground of not wishing to offend John Campbell’s family, that the brothers of Andrew Campbell were called as witnesses to the bond ; and the secrecy of the transaction is justified by the same consideration. As to the age of this man, I can only say that much older men than he often retain their intellectual faculties in tolerable vigour ; and as to his particular case, an archness and sagacity is discoverable from the circumstances detailed in the testimony, wholly incompatible, as is before said, with the idea of dotage.
These deductions have arisen out of a general and comprehensive view of the whole testimony : at the same time it is readily admitted, that particular portions of this testimony might be selected, which, taken singly, and being highly coloured, would seem to lead to a different result. It is ex-cuseable in counsel, but not in Judges, to select and rely on such parts of the whole testimony, and such only, as seem to favour the opinions they adopt and maintain.
With respect to the promise or promises made prior to the marriage ; the bill, in the first place, charges such promises to have been made, (but without saying to whom,) before and at (as well as after) the time of the marriage: it then goes on to charge a promise made to Andrew Campbell before the marriage, accompanied with a reference to the will. In the interrogating part of the bill, the defendants are asked whether John Campbell did not promise to his daughter Rebecca the land in question, and whether *630 he did not renew said promise to one or both of'the complainants before the marriage? The answer of * John Campbell, in reply, omits to confess or deny a promise made to his daughter, but denies having renewed the promise before their marriage. This answer is not perfectly satisfactory on this point; but, inasmuch as the promise to the daughter, if made, was probably revocable, and did not necessarily enure to the benefit of her future husband; the answer ought, probably, to be taken as containing substantially a denial of the promise on which the appellees rely. I am, therefore, willing to give to this answer more credit than the Judge who has just spoken has given it. Having (without any testimony to that effect that X can perceive) inferred that John Campbell was in his dotage ; and this, although that fact was neither charged nor put in issue, that Judge certainly ought not to place much reliance on his answer. We come then to confront that answer with the conflicting testimony : that testimony (if strong enough, under the established doctrines on this subject) is competent to outweigh the answer, as to the fact of the promise having been made ; although that promise may not (in itself) confer a right under the act of frauds, unless it be reduced to writing.
Admitting the promise in question to be denied by the answer; still there can be no doubt but that it is established by the testimony. The testimony of James Campbell, as to this point, is'important. He is the father of one of the appellees, and seems to have taken a warm interest in his son’s obtaining redress in this case ; (believing him to have been injured ;) but his competency and credibility are in no way impugned. His declaration, so much vaunted of, respecting his keeping a still, and John Campbell’s liability to drink, may be accounted for on the ground of delicacy, and a wish to avoid censure from a family so hostile to the interests of his son ; and does not necessarily import a fraudulent intention, or conduct, on his part: the frankness of the declaration, which he could not but know would be eagerly clutched at, seems to repel such a conclusion. He swears positively that, prior to the marriage, John Campbell and Andrew Campbell having had a conversation relative *thereto, “he was called in ; and the defendant, (John Campbell,) then in his presence, gave to A. Campbell his hand and promise, that, if he married his daughter Rebecca, he should have the plantation he then lived on, provided he complied with the terms of the will; and then repeated the contents thereof,” &c. X shall presently have occasion to say, that I might, probably, be justified in considering this conversation as amounting substantially to a request to marry his daughter: at present, I merely refer to it to shew that a promise is expressly proved, so far as it can be proved by the testimony of one witness. James Campbell details, in another part of his deposition, a confession by John Campbell, after he had offered the land for sale, which is equally strong to import a promise, and to shew the archness (if not knavery) of the old man : he confessed a promise, by saying that “if he had not done so,” (i. e. promised,) “perhaps he, the complainant, would not have married his daughterby saying, “that promises and pye-crusts were made to be broken and by telling a story of a man who had married all his daughters by “promising them severally his plantation.” The account of this confession is entirely, and almost literally, corroborated, by the testimony of John Quinn, who was then present; and is also confirmed by that of P. Eagle, except as to two circumstances which will now be briefly examined. Eagle says that John Campbell, on being asked several times by James Campbell, whether he had not promised the land, said no ! This denial, however, was not heard by either of the other two witnesses ; and seems to have been afterwards retracted ; as it would seem from John Campbell’s admission, inferable from the before-mentioned maxim respecting promises and pye-crusts, and the story of a man who had married off his daughters ; all of which this witness heard from the lips of John Campbell. Eagle indeed says, negatively, that he does not recollect having heard John Campbell say “if he had not promised his land, perhaps A. Campbell would not have married his daughter but the force of this negative testimony *is incompetent to prevail against the positive testimony (respecting it) of two witnesses ; for the reasons forcibly mentioned by Judge Tucker, on a similar point, in the case of Rowton v. Rowton.(a) Thus, Eagle’s testimony seems to be, at least, neutral on this subject. It is, therefore, proved by two competent witnesses, (in opposition to rather an equivocal answer,) that John Campbell confessed, at this time, that he had made the promise before the marriage : it is also proved by James Campbell that he heard him make it, as has been before particularly stated.
John Campbell, therefore, made a promise, before the marriage, to the purport before mentioned; a parol promise, indeed, and therefore not in itself, sufficient under our act of frauds. If necessary, I might perhaps, justly contend that that promise also involved a request to marry.
The promise is that, “if Andrew Campbell married his daughter, he would give him the land.” Now, when a due regard is had to the delicacy of the situation of a father contracting for the marriage of, or requesting another to marry his daughter, it is supposed that this is as literal a request to marry the daughter as can ever be expected, and, therefore, might, perhaps, be considered as amounting, substantially, to a request to marry. On this point, however, I am not so sanguine, as on that of the moral duty, arising out of the parol promise, to be presently noticed.
A marriage had on request, though past, will operate as a consideration to support a future promise, (b) Nay, it is even held that an assumpsit made in consideration that another had married my daughter, is binding; for the affection and consideration always continues, (c) These authorities go to shew, that the promise, (though by parol,) and the request, if made, (or either of them,) would be a sufficient consideration to sustain *631 a written agreement made after the marriage ; if it be otherwise sufficient under the act of frauds. It will be coupled and connected with such future agreement, not as a part of the promise, (the declaration *and terms of which ought to be in writing,) but to shew a consideration which will make the future and written promise valid.
Admitting then this parol promise to have amounted to a request only, it will (other things conceded) suffice for our purpose. But, considered as a promise, it laid the maker under a moral obligation, which, although no Court of Law or Equity could enforce, affords a sufficient consideration to support a future written agreement.
On this subject, I will beg leave to quote the following passage from the opinion of Lord Mansfield, in the case of Hawkes v. Saunders:(a) “Where a man is under a legal or equitable obligation to pay, the law implies a promise, though none was ever actually made. A fortiori, a legal or equitable duty is a sufficient consideration for an actual promise. Where a man is under a moral obligation which no Court of Law or Equity can enforce, and promises, the honesty and rectitude of the thing is a consideration. As, if a man promise to pay a just debt, the recovery of which is barred by the act of limitations ; or, if a man, after he comes of age, promises to pay a meritorious debt contracted during his minority, but not for necessaries ; or, if a bankrupt in affluent circumstances, after his certificate, promises to pay the whole of his debts ; or, if a man promises to pay a secret trust, or a trust void, for want of writing, by the statute of frauds. In such, and many other instances, though the promise gives a comjjulsory remedy, where there was none before, either in law or equity ; yet, as the promise is only to do what an honest man ought to do, the ties of conscience upon an upright man are a sufficient consideration.”
This authority is so apposite and conclusive as to the sufficiency of the parol promise, viewed merely as a consideration, that I shall forbear to add anything to it, and proceed to inquire whether the paper of May 9th, 1793, is such a writing as, supported by the consideration of the promise aforesaid, stands justified by the act of frauds.
*1 will first consider that paper as merely a written agreement, this being the strongest ground for the appellants ; and then briefly advert to its effect when considered as a bond or specialty.
That paper is, on its face, a regular bond with a collateral condition. That condition is, that the obligor would abide by the terms of his will, which, however, are somewhat mistaken in the condition of the bond. It gives a right at law, either to go for the whole penalty, or for damages, for breaches, even exceeding the penalty, toties quoties. In equity, it furnishes ground to compel a specific performance, which ground is that stated in the condition. Admitting the sufficiency of the signature, therefore, there is no objection to a, specific performance of the covenant stated in the condition; and it is immaterial, in this point of view, whether it be adjudged a valid bond, or merely a writing comprising the terms of an agreement respecting the sale of land. The obligor was not only illiterate, as he could not write, but the persons who filled it up were also illiterate, as appears from their inserting the day of the month in a wrong place. Both these results are also justified, by finding-, that although a scrawl or seal was annexed by 1he scrivener at the end of the condition, yet John Campbell signs, and is permitted to sign his name, at the end of the penal part of the bond; thus withdrawing the paper (as it is now contended) from the rank of a specialty. These circumstances will have their due weight in forming a construction. The only question is, whether the signature in question extends to and covers the whole writing, or only the penal part of it. To shew that the former was intended, it will be seen that the appellant, John Campbell, although he denies having “signed a bond which conveyed the land,” (thereby, possibly, meaning to bottom himself upon the objection arising from his irregular signature now in question,) expressly admits, in his answer, that, at a previous time, he had agreed to sign a bond, “conveying the land to the complainants;” which, however, was ultimately refused, because, as he alleges, * Andrew Campbell refused to pay the 101. towards his daughter Hannah. At that time, therefore, such a collateral bond as this was intended, and not a bond for the payment of money only, of which there is no pretence that any was due from John Campbell to Andrew Campbell. Besides, Agues Thompson tells us, that John Campbell left a will with her, whereby to disprove the signature to a certain writing “conveying his lands to the complainant,” thereby denying the execution of the bonds in question, but admitting its purport to be, (if executed,) to “convey the land.” James Campbell swears, that he read over the writing “here produced,” (by which I understand the bond, and the whole bond annexed to the bill,) twice to John Campbell, who expressed a willingness to sign the same. It is also proved by this witness, that he had frequently heard John Campbell say, he intended his plantation for Rebecca, and had made his will accordingly, which, indeed, is admitted by the answer; thereby shewing a correspondence of intention, as applying to the respective papers. Michael Campbell, a subscribing witness, says, the writing now here produced, dated 9th May, 1793, was presented to John Campbell to sign, who said he would sign it, (that is. the whole writing now produced,) if it would do the complainants any good; and which he did sign, being perfectly sober, and not having required it to be read; and this account is essentially supported by the testimony of James Campbell, jun. the other subscribing witness. This paper is also always called, and considered as a bond by all the parties ; a circumstance inconsistent with the idea of withdrawing the signature from the scroll or seal. A signature, unaccompanied by a seal, does not constitute a bond or specialty.
After all this, can it be said that a part only of the bond was executed, from the mere circumstance of misplacing the name of the obligor, by an illiterate man, under the direction of illiterate parties, and thereby not only *632 departing from the uniform intention of both parties, as established *by the testimony, but also saddling John Campbell with a debt he never owed or contracted, and which neither party ever dreamt was due or payable ?. Shall this Court, which regards substance, and relieves against mistakes or accidents, be so rigid? It is presumed the bond or writing is good for some purpose; and, is it not better to conform to than violate the intention of the parties ? The least, therefore, that we can say respecting this signature, is, that the bond was signed in the wrong place by mistake. This conclusion the testimony fully justifies ; but, if it were not through mistake, it arose from a palpable fraud in John Campbell, possibly under the guidance of those who wished him to evade and defeat the effect of the promises before mentioned. Whether, however, it arose from mistake or fraud, the circumstance ought not to avail him. I should, therefore, rather incline to consider this as a bond or specialty; to consider it as if John Campbell’s name was placed opposite to the seal; in which case the consideration need not be inquired into. If it. be said that this mistake is not charged or put in issue, it might be answered, that the instrument is charged and relied on as a bond, and that the intrinsic circumstances of the case bespeak it to be such. It was, perhaps, unnecessary to resort to testimony aliunde on this point, forres ipsa loquitur: that testimony, however, as disclosed in that cause, corroborates and confirms this conclusion.
It is not essential to the appellees, however, that this paper should be supported as a bond. A written agreement, under the statute, is sufficient. As to these, the doctrine of the law is liberal. It is held that a signing the name at the beginning, as, “A. B. agrees to sell,” &c. is sufficient, although a place be left for the signature at the bottom ; and yet, as was held by Eord Eldon, it is impossible not to see that the insertion of the name at the beginning, was not intended as a signature, and that the paper was meant to be incomplete, until it was further signed.(a) That case is much stronger than the one at bar. In that case, a further signature *was intended ; and yet the instrument was held to be sufficient. In this case, the writing was consummated, and, under all the circumstances and testimony, is entirely perfect, unless it be defeated by the ignorance, mistake, or fraud of the contracting parties, in relation to the place where the name of the obligor is signed.
I consider this writing, then, to be fully sufficient, either as a bond, or as a written promise under the act of frauds, the objection of misplacing the signature notwithstanding ; and that, as a writing, the parol promise comes in aid as an adequate and sufficient consideration. It remains to inquire whether the land shall be decreed to Andrew Campbell, in conformity to the terms of the bond, or to his wife, as is provided for by the will. The writer of the bond was either under the vulgar mistake, that what belongs to the wife belongs to the husband, or had mistaken the terms of the-will, which had been suppressed, and was withholden by John Campbell; but it is evident that the will was referred to, and contemplated, as forming the standard, by both parties ; and, if (as is established) a writing which does not contain the terms of the agreement, can be supplied by reference to another writing which contains them fully, it would seem to follow, that a writing, referring to another, may be corrected by the writing referred to.
On this ground, I think the decree of the Chancellor erroneous, so far as it gives the land to the husband and wife, and that it ought to be corrected, and the land decreed to the wife only. With this variation, the decree is entirely satisfactory to me, on the grounds I have stated, but not precisely on those stated in the decree itself.
Having, throughout this whole case, en-deavoured to find out and keep steadily in view the true points, and those only, on which this cause will be found to turn, I have omitted to surcharge myself with adjudged cases, and to puzzle and bewilder my judgment with unsatisfactory, and, perhaps, inconsistent decisions, in relation to the construction, by English Judges, upon some questions arising out ''of the statute of frauds. As to the promises made before the marriage, I do not contend that they will stand the test of that statute ; but the promise made thereafter, (as evidenced by the bond or paper of May 9th, 1793,) is full up to the requisitions thereof.
As to the appellant, Argenbright, he is a deliberate purchaser, at his own risk, after full notice of the claim in question. It is not proved, that the appellees stated to him, or in his hearing, that they relied only on the bond; (whatever he or others may have understood on the subject ;) but, if it were so, that bond or writing, either in itself, or as supported by the consideration aforesaid, is competent to overreach him.
JUDGE EEEMING.
The principal points in this cause seem to be,
1st. Whether the case be within the statute of frauds and perjuries ?
2d. Whether the paper purporting to be a bond from John to Andrew Campbell, was or was not, fraudulently obtained ?. If not,
3d. What effect it ought to have in the cause ? And,
4th. Whether the appellant, Argenbright, had not sufficient notice of the plaintiff’s claim, before he purchased the land in question of John Campbell ?
Having taken a comprehensive view of the case, it has made a very different impression on my mind from that of the worthy and learned Judge who first delivered his opinion. I agree with him, that there seems to be evident marks of fraud on the face of the transactions ; but they appear to me not to have been on the part of the complainants, but principally on the part of the defendant, John Campbell. I shall briefly notice the substance of the bill, the answers, and the evidence in the cause, and must unavoidably travel over some of the ground that has been already taken.
The bill charges, that before, at the time of, and after the marriage of the complainants, the defendant, John Campbell, *father of the complainant, Rebecca, promised to give her the land in ques *633 •tion, (on which he then dwelt,) subject to the payment of SOI. to his younger daughter .Hannah, which the complainants ayer they were always ready to do. That before the marriage, in conversation between the complainant, Andrew, and the defendant, John, about the marriage portion he intended to give his daughter, the said John informed the complainant, Andrew, of the disposition he intended, and then promised to make, of his land aforesaid ; of the will he had made to that effect, and that the same was deposited in the hands of his attorney, Archibald Stuart, who had drawn the same ; and after the marriage referred the complainant to Stuart to see the will, and to ask his advice, whether it was sufficient to secure the land to the complainants after the said defendant’s death. That Stuart answered to his inquiry that the will was sufficient, provided Campbell should not revoke it, which he always had power to do. That J. Campbell said he honestly intended to fulfil his promise made as aforesaid, and if his will, (which he thought sufficient to convey the land,) was thought insufficient for the purpose, he would execute a conveyance, or give any writing which should be considered so, that would not devest him of the land during his life.
In consequence of which the complainants took advice, and for that purpose had a bond drawn conditioned for conveyance of the same agreeable to his original promise. That the said J. Campbell did execute the bond conditioned as aforesaid, and therefore the complainants rested satisfied that, at the death of the said J. Campbell, who was upwards of eighty years old, the land would be theirs ; and in the mean time, if their circumstances made it necessary, they had the promise of living on the land with the said John, whereby there would be, intermediately and finally, a competent provision to support the estate of the matrimony into which the complainants had entered ; who were not a little surprised when they understood that J. Campbell was about to sell the land to the defendant, Argén - bright, *who well knew the claim of the complainants before he proposed purchasing.
The complainants took advice; made known their claim to Argenbright ; and published the same in the Staunton paper, and recorded the bond in the District Court of Staunton. The complainants are informed and believe, that after theseste.ps were taken, the defendants went to the house of the attorney aforesaid, and took up the said will.
That the defendant, J. Campbell, sold and conveyed the whole of the land to the said Ar-genbright, and refused to permit the complainants to reside on the same although thereto requested.
This hill states a chain of plain, simple, and to my mind probable facts; we shall see, by-and-by, how far they are supported by evidence.
The answer of John Campbell, appears to be drawn with great professional acuteness ; it is equivocal, elusive, and disingenuous ; and is in substance as follows : That some time before the marriage of the complainants, he made a will, and left the land in question to his daughter Rebecca, upon condition of her paying to his daughter Hannah, 161. per annum, until SOI. should be paid, but never knew that his daughter was going to be married to Andrew Campbell, till the day they were married ; and never renewed the promise before their marriage, further than that he had not, as yet, altered his will. That after the marriage, Andrew wanted the defendant to sign a bond, a paper that the land was to be the complainants’ at the death of the defendant ; and at the time the said bond was to be executed the said Andrew was to pay 101. part of SOI. to Hannah ; but, at the time the said bond was presented, the said Andrew refused to pay the said 101. hut said he would have all or none, after which he altered his will, and left his daughter, the complainant, a share, provided she had issue ; otherwise she was to have nothing. He denies remembering that he referred the complainant, Andrew, to Archibald Stuart, to know whether the will was sufficient to secure the estate to the complainants.
*The first striking impropriety, and evasion in this answer is, that “the defendant never knew that his daughter was going to be married to Andrew Campbell till the day they were married which strongly implies that he never knew such an event was agreed on, or contemplated by the parties ; and this with a view, no doubt, to hold out the idea, that he could not have made the promise charged in the bill, previous to the marriage, when it turns out upon the evidence, and particularly by that of Mr. Scott, the minister who married them, that he was only ignorant of the particular day on which the marriage was to be consummated ; for Scott deposed that the marriage was talked of in the neighbourhood previous to its taking place, and thinks they were acquainted with it, but not as to the time, which is proved by other testimony in the cause. But there is still a more obvious evasion in the answer, where the defendant denies that he ever signed a bond that conveyed the land aforesaid from him to the complainants. This declaration is not responsive to any part of the bill, in which there is no charge, tha't he ever did sign such a bond; and seems an artifice to evade answering, whether he did or did not sign the bond charged in the bill; which was a bond conditioned that he would convey the land agreeable to his original promise, which I presume, from his evasion, he could not deny ; and his not having answered that particular charge, seems to imply an acknowledgment that he did sign that charged in the bill ; but however that may be, the fact is proved by two subscribing witnesses.
He does not positively deny having referred the complainant, Andrew, to Archibald Stuart, to know whether the will was not sufficient to secure land to the complainants, but says,“he does not remember to have done so but it is proved by the deposition of James Campbell, of wffiose credibility I shall speak hereafter.
The answer of Argenbright denies any knowledge of a contract between the complainants and the other defendant for the land in question, either before or after the marriage, but says he understood that Andrew Campbell claimed *altogether under the bond, and will, alluded to in the bill. He got a sight of the bond and was *634 advised, that he might safely purchase. The remaining part of the answer consists chiefly in what he heard the other defendant, John Campbell, say, to whom he gave the full value of the land in question.
In considering the evidence, which is voluminous, and in some instances seemingly contradictory, I shall first notice the answer of John Campbell, so far as it tends to support the principal charges in the bill. He acknowledges thal some time before the marriage, he made a will, and left the land in question to his daughter Rebecca, upon condition that she should pay his daughter Hannah, 101. per annum, until 501. should be paid, and that he did not alter his will until after the marriage was consummated ; that after the marriage, Andrew wanted him to sign a bond or paper, that the land was to be the complainant’s at his death ; and at the time the said bond was to be executed, the said Andrew was to pay 101. part of 501. to Hannah, but at the time the said bond was presented, Andrew refused to pay the 101. but said he would have all or none; after which the defendant altered his will. This confession in the answer strongly corroborates, and to my mind, gives additional force and credence to the testimony of James Campbell and others, in favour of the appellees ; and it may be here remarked, that by the will, which the defendant, John Campbell, confesses he had made in favour of his daughter Rebecca, previous to the marriage, she was to pay nothing to Hannah, until after the death of t'he testator, as she could take nothing by the devise, before that event should happen ; and although a will is revocable, at any time during the life of the testator, yet, as the will in question was completely executed, and the contents held 'out to Andrew Campbell, by the testator, as an inducement to him to marry his daughter, I think it takes the case out of the statute of frauds and perjuries, so far at least as to let in all the oral testimony in the cause. The evidence of James ^Campbell is further strengthened by the testimony of Jane Smith and Hannah Campbell, two of the defendant’s witnesses, who are daughters of the defendant, John Campbell.
Jane Smith, on being interrogated, says, that she heard her father say words to this amount; “that he, Andrew Campbell, was welcome to come and live with him,” and that he appeared to be satisfied with the parties after the marriage. And Hannah Campbell, on being interrogated, says that she, at different times, heard her father say, that he intended to give the plantation he then lived on to Andrew Campbell after he was married to her sister.
This evidence then of the defendant’s witnesses, so perfectly coincides with the testimony of James Campbell, and is so consistent with what John Campbell himself confesses were once his intentions, that I cannot but give full credence to the whole of his deposition ; and though it appears from other testimony, that on one or two occasions, he shewed uncommon warmth in the business, it might well arise from a conviction that they were about to do great injustice to the complainants.
James Campbell, senior, then clearly proves to my satisfaction, the solemn promise made by John Campbell to Andrew Campbell, that if he married his daughter Rebecca, he should have the plantation he then lived on, provided he complied with the terms of the will, which he repeated, and were, that he should pay 101. per annum to his daughter Hannah, until 501. should be paid, which is precisely what J. Campbell himself confesses, in his answer, was the substance of the will he made previous to the marriage, which I doubt not was a principal inducement for Andrew to marry his daughter ; and as such was by him held out to the said Andrew with that particular view.
That after the marriage took effect the promise was repeated by J. Campbell, with this natural and striking circumstance, that he asked the complainant to go with him to plant fruit trees which he said were for himself, and which the deponent understood was done by the said Andrew.
*That after the marriage, and for the purpose of securing the land to the complainants, the defendant, John, agreed to enter into a writing, and one was drawn, (which is now here produced,) and read over twice to the defendant, who expressed a willingness to sign the same: but the depo.nent would not agree it should be signed at his house, lest it should be said that (as the old man was subject to drink, and the deponent kept a still) an advantage had been taken of him. That he continued willing to sign the bond, until he visited Samuel Henry, and some of his friends, after which he said he had altered his will, and that his said friends had advised him to do so, although it was against his will.
The deponent afterwards asked the defendant, John, why he made the promise if he did not intend to comply with it ? to which he answered, “if he had not done so, perhaps the complainant would not have married his daughter, and that promises and pye-crusts were made to be broken and told a story of a man “having married all his daughters, by promising them severally his plantation, arid that the last had taken him in by obtaining a writing as the complainant was now going todo.”
John Quinn deposeth the same as the latter part of James Campbell’s deposition, and particularly that in answer to James’s question, why he made the promise if he did not intend to comply with it, he said that promises and pye-crusts were made to be broken; and also said, if I had not promised him the land, perhaps he would not have married my daughter ; and then went on to repeat a story of a man’s marrying his daughters by promising his plantation.
To lessen the force of this testimony the defendants rely on the deposition of Peter Eagle, who says he was present at the time when John Campbell asked Andrew why he had forbid the sale of his land, to which Andrew replied, he had a right to do so, as he was about to sell it; which was followed by a conversation of some length, till James Campbell came in, and asked the said John, if he had not promised the said Andrew the land ? To which he replied, *no: and, after being much teased, at length replied, “promises and *635 pye-crusts were made to be broken,” and then told a story (as mentioned in the depositions of Quinn and James Campbell) of a man who married several daughters by promising them his plantation, the particulars of which he does not recollect : but remembers to have heard among the neighbours that Rebecca was to have the plantation; but does not remember to have heard the defendant, John, speak upon that subject, before the conversation above stated.
This deposition of Peter Eagle, relied on by the defendants to lessen the force of Quinn’s and James Campbell’s testimony, seems to me to corroborate, and give additional credit to it.
In the deposition of Alexander Thomson, (another of the defendant’s witnesses,) we have a key to John Campbell’s motive for altering his will though the witness is not positive in any part of his testimony. He says that he formerly wrote three wills for the defendant, John, none of which agreed in their contents; that he saw, he thinks the will drawn by Stuart, but remembers not its contents; but recollects that he advised him to alter it, observing, that if he fulfilled it, he would, before a year, be on the parish, upon which he thinks he said he would have it altered. He thinks he wrote a will since the one written by Archibald Stuart, which altered said will, and did not leave the land to the complainant, Rebecca.
This idea held out by the witness to John Campbell, that, if he fulfilled the will written by Stuart, he would be on the parish before a year, seems a mere bugbear held out to frighten him, as the will could have no effect during the life of the testator; but it appears to have answered the purpose of the adviser.
2. As to the second point, whether the bond or writing in question was fraudulently obtained, I must notice, that although he had, after having agreed to sign it on its being twice read to him, afterwards refused, for reasons before stated, he at length retracted his former refusal, and did *sign it in presence of two witnesses, who both declare that he was duly sober at the time ; and this, it appears to me, he was bound in conscience to do, being in conformity to a promise before solemnly made. As to the time and place of its having been done, I think it immaterial, nor do I think that the circumstance of the instrument’s being witnessed by the brothers of Andrew Campbell, lessens at all the authenticity of it, as they probably were the most convenient witnesses, and there is no impeachment of the credit or veracity of either of them.
3. With respect to the effect the instrument of writing ought to have in the cause, it is laid down in the case of Montadle v. Maxwell, 1 Strange, 237, that a parol promise on marriage is not alone sufficient to charge a party making the promise, yet it is a good consideration to support a settlement made agreeable to it, after marriage ; and so it was decided in the case of Robinson v. Brock, in this Court, (a) And Lord Mansfield, in giving his opinion in the case of Hawkes et ux. v. Saunders, (b) laid it down as a sound general principle, that, where a man is under a moral obligation which no Court of Law or Equity can enforce, and promises, the honesty and rectitude of the thing is a consideration; and stated several cases to elucidate the doctrine ; and one of them was, where a man promises to perform a secret trust, or a trust void for want of writing, by the statute of frauds. Though I do not consider the case before us as standing on a bare parol promise before marriage ; for I cannot lose sight of the will of the defendant Campbell, which in his answer he confesses he had made previous to the alleged promise ; and which it is in evidence, he particularly referred to at the time of making the promise ; (holding it out as an inducement to the marriage ;) and, though it had been made some time before, and was then in the keeping of Mr. Stuart, his attorney, I view it in the same light, and think it ought to have the same effect as if he had held it in his hand, and had read it to the complainant, Andrew Campbell, and must operate at least as a memorandum or note in writing signed by the '"'party charged, of sufficient validity to take the case out of the statute of frauds and perjuries.
But it is objected, 1st. That the instrument is not agreeable to the promise charged in the bill, even with the defeasance at the latter end of it ; because the promise (if made at all) was to give the land to his daughter Rebecca, and the defeasance in the writing states, that J. Campbell had by his will bequeathed the land to the said Andrew and his heirs; 2d. That, at most, it can operate against John Campbell, but as a simple promissory note, unconnected with the latter part of the instrument, he having signed the obligatory part of it only. With respect to the first objection, the variance seems to have arisen not from an intention of fraud, but from a mistake either in Andrew, or in the person who drafted the instrument, with respect to his interest in the lands devised to his wife, supposing it to have been the same as if it had been the personal property : and the mistake lies only in the recitals as it goes on to refer to the will which John Campbell was not to alter or change, so far as it related to the land in question ; by referring to which, as stated by John himself in his answer, the true intention of the parties may be fully understood.
As to the other objection, I consider the instrument of writing as one entire thing, and not to be taken separately ; and, though it is unskillfully drawn, and informal, yet it seems to me it sufficiently states the intention of the parties to give it validity; and the style, or form, in which the obligatory part is written, shews that it was intended to operate as a bond, with a condition or de-feasance, and not as a simple promissory note.
As to the part of the paper on which the obligor signed his name, I think that immaterial ; he signed and delivered it as his act and deed ; and that I think sufficient to bind him in equity, notwithstanding its informality.
As to the fourth point, it appears to me *636 t)iat the appellant Arganbright had sufficient notice of the claim of the appellees before his purchase ; he, therefore, made it at his peril, and must abide the consequences.
*1 am of. opinion, however, that the Superior Court of Chancery erred in decreeing the conveyance from the appellant Argenbright, to be made to the appellees jointly, when it ought to be made to the appellee Rebecca only, agreeably with the original intention and promise of her late father John Campbell, now deceased ; but that the decree is correct, and ought to be affirmed in all its other parts.

 2 Atk. 324.

 See 1 Fonb. c. 3, s. 8, and notes thereon; 3 Ves. jun. 499. 8 Hen. Black. 63, Rondeau v. wyatt; 3 Ves. jun. 23, 84, Moore v. Edwards; 8 Ves. jun. 38, Pym v. Blackburne, note (a.)

b) Fonb. 181, note (d.)

c) 2 H. Bl. 63.

 1 Fonb. b. 3, s. 8.

te) 6 Brown’s Pari. Cas. 45.

 2 Brown’s Cha. Cas. 559.

fe) 2 Brown’s Cha. Cas. 563, 564.

 See 3 Brown’s C. C. 154, Rondeau v. Wyatt.

 6 Brown’s Cas. in Pari. 45.

 4 Ves. jun. 23.

 Ibid. 91.

 Ibid. 720.

 Note by tbe Reporters. See tbe case of Dangerfield and others v. Claiborne and others, in tbe Superior Court of Chancery for the Richmond District, ante, vol. 2, p. 17.

 Pymv. Blackburne, 3 Ves. jun. 34.

 1 Ves. jun. 326.

 6 Ves. jun. 39.

ta) 1 Hen. & Munf. 92.

 See 3 Bro. Cha. Rep. 400, Redding v. Wilkes.

 Bradie v. St. Paul, 1 Ves. jun. 326.

 2 Atk. 324.

 2 See Powell on Contracts, 221.

 10 Ves. inn. 305, Mortlocke v. Buller.

 October, 1804, MS.

 2 Wash. 130.

 3 Call, 389.

 1 Hen. & Munf. p. 97.

 Dyer 372.

 Cro. Eliz. 741, Barker v. Halifax.

 Cowp. 290.

 Sugrden’s Law of Vendors, p. 54.

 1 Hen. & Munf. 212.

 Cowp. 290.